

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | **WD77812** |
| **v.** | ) | |
| | ) | **OPINION FILED:** |
| | ) | **June 21, 2016** |
| **CASSI DANIELLE LICATA,** | ) | |
| | ) | |
| **Appellant.** | ) | |

### Appeal from the Circuit Court of Ray County, Missouri
### The Honorable Kevin L. Walden, Judge

### Before Division Four: Alok Ahuja, Chief Judge, Presiding, and
### Mark D. Pfeiffer and Karen King Mitchell, Judges

Cassi Licata appeals, following a jury trial, her conviction of the class D felony of interference with custody, § 565.150,[1] for which she was sentenced to nine months in the Ray County jail. Licata argues that the evidence was insufficient to support her conviction. We affirm.

### Background[2]

Licata and Josh Cringan (Father) had a tumultuous relationship, during which they had Child. Several times throughout the relationship, the couple would split up, have custody battles

---

[1] All statutory citations are to the Revised Statutes of Missouri 2000, as currently supplemented.

[2] "'The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict.'" *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012) (quoting *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005)).

over Child, and then reunite, only to split up again later.  The procedural history is as follows:  On September 17, 2010, Father established paternity of Child; Father subsequently filed a motion to modify the paternity order to grant him legal custody of Child; the family court held hearings on the motion to modify on August 29, September 4, October 1, and October 26, 2012; both Licata and Father were represented by attorneys during the custody hearings, and both Licata and Father appeared personally at each of the hearings.  Following the October 26, 2012 hearing, the family court made a docket entry ordering that:  (1) beginning on Friday, November 2, 2012, through Sunday, November 4, 2012, and every other weekend thereafter pending final judgment of the court, Father would have unsupervised visitation with Child; (2) all pending orders of protection against Father were set aside and voided going forward; and (3) the attorneys were directed to submit proposed findings of fact and conclusions of law and a proposed Judgment before November 9, 2012.  The family court held an in-chambers conference on November 19, 2012, where only the attorneys appeared; following the in-chambers conference, the family court awarded sole legal custody to Father and joint physical custody, with a parenting plan, to Father and Licata.  Pursuant to the plan, Father's residence was designated the residence of Child for legal, mailing, and educational purposes, and Licata was given four hours of supervised parenting time each week for the first six weeks, after which she was provided parenting time on alternating weekends and certain holidays.

Licata never showed up to transfer Child to Father on November 2, 2012, or any date thereafter.  Instead, Licata checked herself and Child into New House women's shelter in Kansas City, Missouri, on November 4 in order to hide from Father.  Licata remained at New House with Child until December 12, 2012.  At that time, she moved herself and Child to Muskogee, Oklahoma, to live in the Women In Safe Home (WISH) shelter.  Licata was trying to get to a Native American reservation in Oklahoma.

When Licata failed to appear for Father's November 2 visitation, Father contacted local law enforcement. After the modification order was entered on November 19, 2012, Father again contacted law enforcement because he had not heard from Licata since before the missed visitation, despite his effort to contact her through a Facebook message—his only means of communication with her. Finally, in March 2013, Father got the Center for Missing and Exploited Children involved. Then, on March 28, 2013, Licata was located and apprehended in Oklahoma. Father was able to finally bring Child back to Missouri in May 2013.

Licata was extradited to Missouri, where she was charged with the class D felony of interference with custody under § 565.150. At her jury trial, the only evidence Licata produced consisted of business records from the two shelters, documenting her stays. The jury found Licata guilty and recommended punishment of nine months' detention. The court followed the jury's punishment recommendation and sentenced Licata to nine months in the Ray County jail. Licata appeals.

## Standard of Review

In her only point on appeal, Licata argues that the evidence was insufficient to support her felony conviction. When an appellant challenges the sufficiency of the evidence, our "'review is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.'" *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012) (quoting *State v. Letica*, 356 S.W.3d 157, 166 (Mo. banc 2011)). "'The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict.'" *Id.* (quoting *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005)). "'This is not an assessment of whether the [c]ourt believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the

3

State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)). "When reviewing the sufficiency of evidence supporting a criminal conviction, the [c]ourt does not act as a 'super juror' with veto powers." *Id*. "In such cases, th[e c]ourt gives great deference to the trier of fact." *Id*.

## Analysis

"A person commits the crime of interference with custody if, knowing that [s]he has no legal right to do so, [s]he takes . . . from legal custody any person entrusted by order of a court to the custody of another person or institution." § 565.150.1. "Interference with custody is a class A misdemeanor unless the person taken . . . from legal custody is removed from this state, detained in another state or concealed, in which case it is a class D felony." § 565.150.2.

Licata argues: (1) that the evidence was insufficient to support the jury's determination that she knew she had no legal right to keep Child from Father; and (2) that, because she did not remove Child from the state until after the date charged, if she is guilty, it is of only a misdemeanor and not a felony.

### A. The evidence supported the jury's finding that Licata knew she had no legal right to keep Child from Father.

"A person acts 'knowingly' with respect to his conduct or attendant circumstances when he is 'aware of the nature of his conduct or that those circumstances exist.'" *State v. Hunt*, 451 S.W.3d 251, 257 (Mo. banc 2014) (quoting § 562.016.3(1)). "Knowledge is typically inferred from circumstantial evidence because direct evidence is rarely available." *Id*. The knowledge required to support a conviction for interference with custody is knowledge that a person has no legal right to take a person from the lawful custody of another. § 565.150.1. Accordingly, the State had to prove that Licata took Child from Father, knowing that she had no legal right to do so.

4

To prove this element, the State offered evidence at trial showing that: (1) Licata had been at every court proceeding before the in-chambers conference granting sole legal, and joint physical, custody to Father; (2) in those proceedings, the court indicated its intent to change the existing custody arrangement; (3) Licata was represented by counsel who was present at the in-chambers conference; (4) Licata fled with Child and went into hiding after the last hearing she attended; and (5) after the court entered its order of modification, Licata fled to Oklahoma in an effort to get to a Native American reservation.

To begin, Licata acknowledges that she knew of the October 26, 2012 court order, which gave Father rights to unsupervised visitation with Child, but claims that her failure to deliver Child to Father on November 2, 2012 (or anytime thereafter), does not support a finding that she violated § 565.150 because: (1) Father's right of visitation did not constitute legal custody, so as to support a conviction under § 565.150; and (2) her failure to deliver Child did not constitute "taking" Child, as is required by the statutory language.

We need not resolve Licata's first argument because Father's right to Child was changed to joint physical and sole legal custody on November 19, 2012. Thus, it does not matter whether the right of visitation he held under the October 26, 2012 order constituted "legal custody" under § 565.150, as it is undisputed that his rights to joint physical and sole legal custody sufficed.

Regarding Licata's second argument—that her failure to deliver Child to Father did not constitute a taking—"[t]he purpose of the . . . statute is to protect *all* court ordered custody against unlawful interferences." *State v. Edmisten*, 674 S.W.2d 576, 577 (Mo. App. E.D. 1984) (emphasis added). Accordingly, the phrase, "takes . . . from legal custody" in § 565.150 "include[s] unlawful retention of any person following a period of temporary lawful custody." *Id*. Here, even though Licata had legal custody of Child before the November 19, 2012 order,

the parenting plan required Licata to turn Child over to Father immediately upon entry of the November 19, 2012 order.[3] Her failure to do so constituted interference.

Licata argues, however, that the evidence was not sufficient to support a determination that she knew of the November 19, 2012 order. Again, we disagree.

Building on the prosecutor's evidence below, the State argues on appeal that Licata had constructive knowledge of the November 19, 2012 order because her counsel was present at the hearing where the order was entered.

"The attorney-client relationship is one of agent-principal." *State v. Pinson*, 717 S.W.2d 266, 269 (Mo. App. E.D. 1986). "The general rule is that notice to an agent while acting within the scope of his authority and with regard to any business over which his authority reaches, is notice to, *or knowledge of* the principal." *Id.* (emphasis added). Though several criminal cases speak in terms of "imputing" an attorney's knowledge to his client, none of them involved sufficiency challenges where the "knowledge" at issue was an element of the charged offense. *See, e.g., Pinson*, 717 S.W.2d at 269 (rejecting defendant's claim that he was unaware that he was charged as a recidivist offender where his attorney had knowledge); *State v. Tunstall*, 848 S.W.2d 530, 534 (Mo. App. E.D. 1993) (same); *State v. Jones*, 959 S.W.2d 829, 833 (Mo. App. E.D. 1997) (rejecting defendant's newly discovered evidence claim where defendant's attorney had knowledge of the evidence before trial).

Here, Licata has challenged the sufficiency of the State's evidence to support the knowledge element of the charged offense. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [s]he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

---

[3] The parenting plan stated: "Physical custody of the minor child shall be delivered by [Licata] to [Father] forthwith upon the entry of this judgment."

Accordingly, the mere fact that Licata's attorney knew of the order cannot serve to alleviate the State of its burden to prove Licata's own knowledge.

That being said, based on evidence that Licata's attorney knew of the November 19, 2012 order, coupled with evidence of Licata's own actions, the jury could have drawn a reasonable inference that Licata's attorney passed his knowledge of the order on to her, even without direct proof of a communication.[4] In addition to evidence of Licata's attorney's knowledge, the State also presented evidence that, after the court entered the October order that favored Father (providing Father with unsupervised visitation and setting aside a previous Order of Protection) and indicated that a ruling on Father's motion to modify was imminent, Licata fled to a shelter in Kansas City for the purpose of keeping herself and Child hidden from Father.[5] Further, following the court's order granting Father's motion to modify, Licata fled the state, hoping to reach a Native American reservation, presumably so that she would be unreachable by legal process. And Licata left the New House shelter in Kansas City after only six weeks, despite the fact that she was permitted to stay at the shelter for a total of ten weeks. This conduct is inexplicable, except when viewed in context of its temporal proximity to the court's

---

[4] Similarly, in the context of driving while revoked, the State is required to prove that the defendant knew his license was revoked at the time of the driving. § 302.321. Abundant case law holds that mere proof that the Department of Revenue *mailed* notice of the revocation to a defendant is sufficient to support the knowledge element; the State is not required to prove that the defendant actually received the notice. *See State v. Ise*, 460 S.W.3d 448, 456-57 (Mo. App. W.D. 2015) (collecting cases).

[5] Licata's counsel argued in closing that Licata's purpose in checking in to the shelters was to keep herself hidden from Father:

> Then on November 4th, Ms. Licata goes into the New House shelter down in Kansas City. That's where she was, in hiding, as Deputy Shepherdson said, in the battered women's shelter. That's where she went with her son early November, before that November 19th order that transferred custody. [Father] didn't know where she was. That was the idea. She wasn't to be found.

Counsel's argument regarding Licata's purpose constituted a judicial admission. "'The general rule is that when a defendant makes a voluntary judicial admission of fact before the jury, it serves as a substitute for evidence and dispenses with proof of the actual fact. The admission is conclusive on him for the purpose of the case.'" *State v. Denzmore*, 436 S.W.3d 635, 643 (Mo. App. E.D. 2014) (quoting *State v. Eacret*, 456 S.W.2d 324, 327 (Mo. 1970)). "'[A]n admission made by an attorney in open court during trial which is against the interests of his clients is presumed to be true and courts are warranted in acting thereon.'" *Id.* (quoting *State v. Vandiver*, 592 S.W.2d 304, 306 (Mo. App. E.D. 1979)); *see also* 32 CJS *Evidence* § 599 (2008) ("A clear admission of a material fact by counsel in opening statements or in closing arguments is binding upon the client.").

November 19, 2012 order. The jury could reasonably infer that she obtained knowledge of the November 19, 2012 order while staying at New House, and it was this knowledge that prompted her to move to the new shelter in Oklahoma. All of these actions support a reasonable inference that Licata knew of the November 19 Judgment.

Licata further argues that her "flight" was not relevant to demonstrate her knowledge of the November Judgment because she fled prior to the Judgment being entered.[6] Again, we disagree. Though her initial "flight" was not a direct response to the November 19, 2012 order (considering that she fled before the order was handed down), that does not render the flight irrelevant. As Licata pointed out at trial, her purpose in fleeing on November 4, 2012, was to go into hiding from Father. By taking Child with her, she presumably meant to hide Child as well. She did this at a time when she knew the court was considering modifying a previous custody arrangement. Further, shortly after the court modified the terms of the parents' physical custody of Child, to give Father joint physical custody and the majority of the parenting time, Mother took the drastic step of fleeing the state in an attempt to escape the jurisdiction of the court. These facts are sufficient to support the reasonable inference that Licata knew of the November Judgment.

Finally, we find Licata's reliance on *State v. Slavens*, 190 S.W.3d 410 (Mo. App. S.D. 2006), misplaced. In *Slavens*, an employee of the Division of Family Services (DFS) advised the defendant that she was taking custody of the defendant's child just before the defendant fled with the child, but there was no evidence that the defendant knew the employee was acting on behalf of DFS or that DFS had been ordered to take custody of the child. *Id*. at 415. Accordingly, the Southern District determined that, "[w]hile this evidence tends to show that Defendant knew that

---

[6] Licata argues that she fled as a result of the October order, because she wanted to avoid Father having unsupervised visitation. The jury, however, was free to reject her characterization of her motivation and conclude that she initially fled in anticipation of the court's ruling on Father's motion to modify.

taking [the child] was opposed by the hospital, it does not tend to prove that Defendant knew that DFS actually had custody of [the child]." *Id*.

Here, unlike in *Slavens*, the person with whose custody Licata interfered was Child's Father, not an unidentified DFS employee. And, unlike *Slavens*, Licata admits that she knew the court had previously ordered that Father have visitation with Child. Furthermore, there was sufficient evidence to support the reasonable inference that Licata knew Father had been given sole legal and joint physical custody of Child. Thus, *Slavens* is inapposite.

**B. The evidence supported Licata's guilt of a felony, rather than a misdemeanor.**

Licata's final argument is that, if she's guilty, it is for only a misdemeanor and not a felony because the evidence demonstrates that she did not remove Child from Missouri until December 12, 2012, nearly a month after the charged date of November 19, 2012. Licata's argument fails for two reasons. First, the statute does not require the removal to be simultaneous with the actual taking in order to elevate the punishment to a class D felony. And second, the State never alleged that the removal occurred on November 19, 2012; the information charged that Licata failed to return Child to Father's custody on or about November 19, 2012, "and[,] *after doing so*[,] . . . removed [Child] from this state." Accordingly we reject Licata's argument that the evidence proved, at most, guilt of a misdemeanor.

Conclusion

The evidence was sufficient to support Licata's conviction and sentence. The trial court's judgment is affirmed.

_____
Karen King Mitchell, Judge

Alok Ahuja, Chief Judge, and
Mark D. Pfeiffer, Judge, concur.

9